v. City of San Antonio. Okay, Mr. Grable. Good morning, Your Honors. May it please the Court. With the District Court denying preliminary injunction in this case, it ignored long-standing Supreme Court precedent that prohibits arbitrary invasion of privacy and security of individuals to include commercial businesses. There are three main claims that we attack here. And so I also want to note, we have to attack every element of preliminary injunction because the Court did not issue any written order. It was by text order. So there's no analysis as to what the Court would have done. Well, he basically, there's no pushback in terms of the constitutional application and administrative searches, blah, blah, blah. So those are spotted. I guess he just sort of cut to the chase on it in terms of it. But you're wide open. We've given you all arguments. So go for it. Yes, Your Honor. So the Fourth Amendment issue, so there's three issues we raise. And I think the most settled issue is the Fourth Amendment. One where the U.S. Supreme Court has opened the door and seemed to pay a lot of attention to is on the Eighth Amendment issues, specifically applied in the civil context. And so, and then the last is the due process issues. Now, the Fourth Amendment, the City of San Antonio has long had a municipal building code, which has allowed for code inspectors to go and inspect the exterior buildings and then they can issue citations. And then those citations can then be challenged in court. What they recently did in March of 2023 was they added additional layer to that. They added a proactive apartment inspection program ordinance, which in addition to citations, in addition to citations, which also include penalties, they created this ordinance that says if you receive at least three citations, then they are assessed as, quote, program points. And when you get these three program points, you are involuntarily enrolled in this inspection program, which from its inception, the City of San Antonio has classified as the, quote, bad actors apartment program. So basically, as a result of this program, this only happens if you violate, you have the opportunity to challenge, you get adjudicated, you have the opportunity to appeal it. So why isn't it just sort of, okay, 311, they call, sewage is there, violation, citation, and now you get some points. And now we're going to focus on you more. So your honor, the, there is no actual appeal process. There's an appeal process for the citation, but the problem is, is once you get the citation, regardless of appeal, you're getting a program point. So before the appeal process even plays out, you are automatically, or my clients were automatically enrolled in this program. But, but, but what I call SO, SO tried to appeal, but they were untimely. Elm Creek did appeal, lost, liability affirmed. Is that So you had a lot of process and the citations stick. So it's not the citations that they had initially. The only way you get points is based on a citation, right? Yes, your honor. You get the citation regardless of, or you get the program point regardless of what you do with the citation. Even if you win on appeal and the citation's gone, you still get the points? Even if you win on appeal, so, so this is another issue with the ordinance. Even if you went on appeal, which could take who knows how long, it puts the burden on the apartment complex to try to undo the program point. The problem is by the time you get to that point, how many monthly or at least monthly inspections are you subjected to? Well, when you say monthly inspections, you're saying monthly warrantless entries. Yes, your honor. Does the record reflect there's ever been a warrantless entry pursuant to this ordinance? There has not been a warrantless entry. Uh, because what ended up happening was there was an attempt to do a warrantless entry. They call you like they do, right? I think you correct me if I'm wrong. I say things forcefully. Um, but they, they called you and said, we'd like to do an inspection, but then they didn't because you didn't consent or they didn't because they just decided not to. They did not because we filed this lawsuit, your honor. And, and my understanding at least is, is, uh, they have, because of this lawsuit, this appeal, they haven't done it. Your challenge is a facial one. They cite the ninth circuit Garcia versus Los Angeles case that if the ordinance doesn't itself say, instead of you have to follow legal restrictions, you actually now have authority to go in without a warrant. Then that facial challenge will fail. Or do you remember that case? Cause I didn't see you respond to it in the reply brief. No, your honor. What I'm, what I'm focusing on is there, there is no reference to legal restrictions. They, they are citing to the San Antonio maintenance code, not to the PR, not to the apartment program program says you can go in without a warrant. Does anything, it does your honor, uh, specifically section six dash seven, one B section six dash seven, one B. Okay. And your honor, you can find that at our way to eight six. Thank you. Specifically it pro it tells the property owner that they're committing a classy misdemeanor. Uh, basically they cannot prohibit bar or obstruct entry of a official code official into, uh, wherever they want to inspect. And so that's the problem we have Kamara maybe cause I obviously I'm not remembering a verbatim instead of basically want to just read the language you say is explicit authorization for them to do warrantless entries. Read the language you're looking at. Yes, your honor. It says, uh, I don't have the exact language in front of me, but I do know, I do know it states specifically that a property owner quote shall not prohibit bar or obstruct entry. And then it goes on. Why wouldn't that be assuming the basic legal regime? If they come with you with a warrant, you can't borrow obstruct entry. So that's the, so, so that's my issue. Your honor, there is no warrant process in the actual ordinance. What it says is that, and we're not even talking monthly inspections, the ordinance says that you are subjected to inspections at least monthly of the entire premises, private areas. And so that's silent. What does it necessarily mean that the entry will be warrantless? Say again, your honor. I mean, because the language is silent about a warrant or not. I mean, why does that necessarily mean that there will be a warrantless inspection? Well, so in Texas, in order to get a warrant, right, there has to be probable cause. And so back to the question, you're making a facial challenge. Yes, your honor. So what's your, your burden making a facial challenge based on the way the ordinance is written? The way the ordinance is written. So big picture. Restate your facial challenge. How are you articulating the facial challenge directly related to what this language is? My clients are subjected to frequent inspections, at least monthly, of private areas of, it's arbitrary because the only purpose of. That's not my question. At some point you got to answer the question I'm asking and not the one you want me to ask. I'm saying you are making a facial challenge, correct? I'm making a challenge facially and as applied. Well, I haven't asked you about it as applied. Right now I want to understand your facial challenge. Just say to me straightforwardly, articulate the facial challenge so I can clearly understand what your facial challenge is and how it connects to the cases you're citing. Yes, your honor. The facial challenge is that the ordinance is, the ordinance mandates monthly inspections without any reference to warrant, any reference to scope, any reference to discretion of the code official. What the ordinance says is that once you are involuntarily entered into this program, you for the next six months, and then it can be extended, you for the next six months have to open your entire property up to monthly inspections so they can go and hunt for civil violations or evidence of criminality. And this type of ordinance has not only been struck down by the U.S. Supreme Court and Kamara v. Municipal Court, but it's also been struck down as 2015 in Grady v. North Carolina. And also, this is a very similar ordinance was struck down, or the Northern District of Texas in 2015, or sorry, in 2005, granted preliminary injunction on a very similar ordinance. And that was in Dearmore v. City of Garland. The issue here in, and then also I cite to the Berger case in the brief, the key thing is even if it was, even if they were to argue that they could do warrantless searches because of closely held, that is closely held, apartment complexes has never been closely held, but even to pass that muster, the regulatory scheme still has to outline specifically the discretion of the code official, the scope of the search, and that's missing here. There's basically, the ordinance just simply says, if we involuntarily enroll you, and in order to get a citation . . . How many warrantless searches have been conducted? On my clients, none. So they attempted . . . Your client's never been subjected to it. They, there was a request that they make available, and that's in the record at . . . But that doesn't sound like they think they can come in if they're calling to say, would you give us permission? Well, Your Honor, what they were doing was they were identifying the units and the areas that needed to be available for inspection, and then they . . . I remember one of them had rotted decks, another one had a stairway that needs repair. Let's imagine a roof that's about to collapse, and the tenants are saying, help us. They call 311, and they come out, and sure enough, there it is. They cite you. Then they do it again, another time, third time, and they're thinking, okay, we're going to focus on this landlord because he's not doing anything about very dangerous situations. Isn't that how it all works? No, Your Honor. So then the violations on each of my clients occurred on a single day, and the violations were generally cited, and they all pertain to things that were on the exterior of the buildings. And by virtue of getting these citations on a single day . . . None of the tenants who would be subjected to this are before a court. It's the apartment owners. I mean, the tenants would be the people whose rights would be progressed by somebody coming in, and none of them are here or have appealed or otherwise been aggrieved by any kind of a warrantless entry. So you represent the apartment owners. You say there haven't been any warrantless entries, and you say that it's a facial challenge, and then you cite other cases, but I'm just still struggling with . . . Are you just quarreling with the way the ordinance is written? Yes, Your Honor. There are no limits on these searches. So that's my problem, is my clients still have a Fourth Amendment right. And to be clear, we are not talking . . . And I put this in the brief as well, in the footnote. We are not talking about . . . We are not talking about occupied units. We are talking about private and unoccupied units, where my clients, the apartment complex owners, have this protected interest. And it is well against arbitrary intrusions. And so by them challenging and saying, you cannot come in here without a warrant. We're going to file a lawsuit. You can't come in here with a warrant. They are risking, under the ordinance, to be subjected to additional criminal and civil penalties. When there are violations of the exterior, they pay the citations. They could be subject to additional citations. That's not at issue. That's a different ordinance. What this ordinance does is say, because we found exterior issues, you now have to open up all your private areas, all of your areas that are not open to the public, all of your unoccupied areas, every month. So is the apartment owner's concern about the authorities being able to come into unoccupied spaces to do this inspection without a warrant? So that's what you're saying? It's without a warrant. Right. They're saying, hey, because we found these exterior issues on the public . . . Because it has nothing to do with tenants and occupied, I guess you would say. Right. So it could be an empty apartment, and because of some whatever outside, and if the authorities want to come inside, then the complaint from your clients is abolished in the Fourth Amendment to be able to come even into an unoccupied by a human being, these spaces. That's the grievance. Yes, Your Honor, and this is well established by the U.S. Supreme Court that there's a Fourth Amendment interest from code officials to be able to do this exact thing. And so our excessive fine issue, and then the due process, and I will, pending any questions, that's all I have for now. All right. Well, we appreciate it. You've reserved your rebuttal time. All right. Thank you. We'll hear from the city. May it please the Court, Chris Cradiville, along with my law partner, Bonnie Kirkland, for the appellee, the city of San Antonio, Texas. Your Honors, I'd like to just dive right in on the Fourth Amendment challenge and why it fails. It fails as applied because as the panel elicited in its questioning, there has been no warrantless search of any property of any appellant in this case. So there has been no warrantless search as applied. These appellants have suffered no harm. The facial challenge fares no better because there's an avoidance construction of the statute that's very easy for this Court, as Judge Rodriguez did below, to, I think, adopt. And that's, this ordinance is silent as to warrants. There is no mention of warrants in this statute. Hearing from Judge Rodriguez and then your brief here, you slightly equivocate as to whether or not you do have warrantless authority to go in. So are you saying clearly now the city of San Antonio is saying you can't go in without a warrant? Your Honor, I think this ordinance exists against the backdrop of the rest of the city code, which clearly contemplates warrants, as well as against the backdrop of the Constitution and the rest of American law. So the answer seems to be yes. So you aren't saying that by virtue of them being commercial landlords, they've consented to warrantless entry? I think there is a secondary argument that we've made because of the hybrid nature of apartments, where they are both a place of business with public and semi-public areas that are open, hallways, common stairwells, common ... Right, but that wouldn't get into private apartments. I mean, so their concern does, as to your secondary argument, they do have a valid point, which is these violations relate to exteriors, and yet they're fearful that you would interpret this new bad actor program to allow you to go, based on an exterior observation, into the interior, and it's not likely a court would give you a warrant approval for that, right? Well, there's administrative warrants, which is a much simpler program. I know, but Camaro is dealing with that, so ... And Mr. Camaro was a tenant. I think that's one of the ... They love Camaro, and I understand why they like that case, but there's a critical distinction that the panel has already elicited. Mr. Camaro was a tenant, talking about his home. Yeah, but this is ... But there's a maximum ... If there's nobody in the place, it's the landlords, and only theirs, withstanding to object to the Fourth Amendment action. Judge Higginson, all that's at issue in this lawsuit, because there is not a tenant plaintiff ... Right, I just don't ... I don't want ... I'm curious ... I don't want the government to have a lurking argument that's secondary, that, oh, by the way, put this program aside, we can still go in, because they consented to it. Your Honor, I think it ... If we look at what actually happened here, if we take his as-applied challenge seriously, and we look at the sequence of facts, even though there's a paucity of preliminary injunction record, my friends on the other side have never seen such a thin preliminary injunction record. They really went all in on the facial challenge with no evidence. We'll get to that momentarily, but what happened here? There was 20 days' notice given of the forthcoming inspection. The statute requires at a minimum 10 days. But again, that doesn't fully answer it. 20 days' notice, we're coming in, or please tell us in the next 20 days if we have permission to come in. Or use that 20 days to file this lawsuit, and as counsel acknowledged, shut down that inspection. Okay, but so just as an officer of the court, if they had not filed the lawsuit, but they hadn't consented, is your position that this ordinance allows your people to go in, yes or no? We would have had to obtain an administrative warrant if they had not consented. Now typically, because we're dealing with areas of de minimis reasonable expectation of privacy, as the court noted, we're dealing with vacant apartments. There is a bare minimum, de minimis, I can hardly think of an area where there's less of an expectation of privacy, where if any potential tenant shows up and wants to lease the premises. I think to be fair to them, what they're saying is they're worried that they're already in the bullseye. And so if you drive by and see sewage leaking outside, they're worried inspectors are going to come and go into every little apartment and try to find more. And then they're in an endless cycle. Well, in the program, in the PAPE program that this establishes, there is, as counsel noted, a monthly inspection. That's correct. That's a matter of this ordinance. Once you're in the program, you're going to be inspected once a month until you're out of the program. But the idea and the goal is to graduate landlords out of the program. It's six months. And if they don't get two more PAPE violations, which is not every violation, it's the more serious violations. Do they have to pay them off? Or can they keep accumulating and not pay? So just as today has applied a challenge, they've paid us nothing. They've paid the city of San Antonio nothing to date. Each citation... Violate them on that? Isn't that a separate... They've paid the citations, but not the PAPE, which they claim is a fine. That's their Eighth Amendment excessive fine argument. There's no evidence it's an excessive fine. Let me just note that the unrebutted, unrefuted testimony of the relevant San Antonio official, Michael Shannon, is that the program's going to cost in excess of $300,000 a year to administer. So... Giving you two inspectors, right? I believe that's correct, Your Honor. Yes, two. But his testimony was this is going to be an expensive program to administer because these are large commercial landlords. This only applies to apartment complexes that have more than five units, and the two complexes here are respectively 325 and 125 units. So large commercial complexes that, frankly, take some effort, some time, and cause some expense to inspect, as we're now doing on a monthly basis. But not everyone ends up in this program. In fact, it's a tiny minority. At the time of the submission of the briefs, there were over 1,200 apartment complexes that had been inspected. Only 19 were in the program. So we're talking about a fraction of a fraction that are in the program. And again, the idea is to graduate from the program by not getting additional citations during that six months, and by cooperating with the inspections. Now, if they don't cooperate with the inspections, we'll have to go get an administrative warrant. But I think the Fourth Amendment, as applied, fails because there's been no warrantless inspection. The Fourth Amendment, facial, fails because there is a plausible reading of this ordinance that doesn't purport to suspend warrants. Okay. Now, he did draw attention to 6-71B. Do you know that off the top of your head? I have the statute in front of me, Your Honor. Let me turn to it. Does that imply that there's a warrantless entry possibility? I think this can be read in concert with the other areas of the city code that we've cited in our briefs that seem to contemplate and plainly do contemplate warrants. This code needs to be read as a coherent whole. I would direct the court- No, we know. Your brief cited the other portions. Why don't you read that little section he says is so damning? The owner shall not prohibit, bar, or obstruct entry by the code official upon the premises or any structure therein of an apartment complex entered into in this program. If they don't consent, we're going to come back with a warrant. If we give them a required 10 days' notice, they say, go pound sand and come back with a warrant, we'll pound sand and then we'll come back with a warrant. I think part of the 10-day notice provision is to give them that opportunity to lodge an objection or, in extreme cases like this one, to go to court and initiate a lawsuit if they want to. So they have notice and an opportunity to be heard. I guess that gets more into their due process argument. But as to the Fourth Amendment, this is not, we're showing up unannounced, unexpected. And as the court already noted, because there's not a tenant plaintiff here, that issue's not before the court. No one's home is being inspected. All that's being inspected are the common areas, common staircases, common hallways. On the due process, if they challenge the citation and they win, are they still in the bad habit? The citation goes away. I think this is not perhaps perfectly drafted as to if the underlying citation goes away, the program point goes away, but I think read as a coherent whole, the program point goes away if the underlying citation goes away. In fact, I think, Judge Higginson, there's more process than would typically be afforded  They can go through the process of challenging the citation, which involves in the first instance a hearing before a municipal administrative hearing officer, or depending on the nature of the violation, before a municipal court. If they don't like the result they get from the hearing officer or the municipal court, they can then escalate into the state court system. That's as to the underlying violation. So they will get their day in court, they will be heard, and it will either be set aside or it will be deemed a violation, and they will be fined. It's a rather minimal fine, right? It's not more than, I think, $500, the fines at issue for these violations, in this case, for these appellants with $300. So we are talking essentially a speeding ticket here as to the citation cost. They get, I think, every bit of process they could possibly want on the citation. As to the program point, there is a separate appellate process that they can go through with the code enforcement officer to either get more time to cure or to challenge it. And those are on parallel tracks. I think... You're talking about a lot of process. There's a lot of process here, Your Honor. Just a couple of sort of high-level points. As I've noted, these are large commercial complexes. This is a statute that's designed to protect low-income, vulnerable tenants. In the affidavits that they put in, the two affidavits, which are, as I noted, very short, they did acknowledge these are low-income housing complexes, and I would posit that the City of San Antonio has a very compelling interest in protecting vulnerable tenants, vulnerable renters, against landlords who don't take care of their property with violations that go to health and safety, like a collapsing staircase, which is, as Your Honor noted, one of the violations here. So San Antonio has a very compelling goal here. That compelling goal is weighed against what's their interest. It's the de minimis privacy expectation in a vacant apartment, because that's all we're talking about here at the end of the day, Your Honors, is vacant apartments. The common areas, the public and semi-public areas, we could show up without any notice and inspect those five minutes before the inspection. As to the tenants, there's the notice issue, and that would be as between the city and  We would go with the lessee, not the lessor. So really, at the end of the day, we're talking about vacant apartments versus a compelling interest in protecting vulnerable families that rent in these low-income apartment complexes, massive, multi-building, low-income apartment complexes. Does the record show what this ordinance is responsive to, what was going on? I presume they're addressing an extent problem. That's right, Judge Higginbotham. The record does reflect there's a memo from city staff to the city council recommending the adoption of this ordinance, and that's what San Antonio city staff cited to was a history of problems of poor maintenance, of poor safety upkeep in these massive, low-income commercial apartment complexes. That's precisely why city staff recommended to the city council to adopt it. The city council took that recommendation unanimously. It was a unanimous vote to adopt this ordinance. The council perceived a problem and adopted this ordinance to correct that problem. Was the ordinance opposed by any of these plaintiffs? The city had a group of stakeholders, 10 stakeholders and two alternates in this industry, a mix of landlords, tenants, and tenant advocates who formulated this statute. That did include landlords. It did not include these two particular landlords who are the plaintiff's appellants here today. I want to point out, my old mentor had a saying that he liked to use often. They hold the keys to their own jail cell. Here these landlords at all times hold the keys to solving this problem. They are given 10 days to cure. If a problem is identified, a collapsing staircase, a broken window, that's another of the violations we have here, a collapsing gutter, they're given 10 days to cure it. If 10 days isn't enough, they can ask for an extension of time from the director of the relevant department with the city of San Antonio. If they cure it, there's no violation. It's only if they ignore it or they refuse to cure it that they get a citation at all. So there's this, in terms of process, Judge Higginson, there's another entire layer of process, the cure process. It's like getting pulled over by a police officer for speeding and the police officer telling you, hey, slow down, or next time I see you, you're going to get a ticket. Well, here they have 10 days to slow down, but if they choose not to slow down, they will get a citation. The citation will be a program point. Both the citation and the program point are separately appealable. Let's talk briefly about the Eighth Amendment argument that they've raised. I think Judge Rodriguez was a little amazed that a $100 fee was, in their view, an excessive fine. And I don't think there's case law to back that up. This fee, and that's what it is, it's a fee to pay for an increased regimen of inspections. So we're now having a monthly inspection for the duration that they're in the program. And it's $100 per unit, or over the course of a year, less than $10 per inspection to pay for this program. It's essentially a user fee. They are using the service that the program provides, regular inspections, and they are paying for it. It is not punitive. The punitive aspect of this is the citation with the up to $500 fine. That's the punitive aspect of this. This is a fee, and the unrebutted testimony is that the fee may or may not even pay for the program. The city of San Antonio may or may not break even on this program. The idea of the fee is to pay for the program in the increased supervisory services that these landlords require based on having three serious citations, safety-oriented citations in six months. I would also note, and this is something that just occurred in preparing for argument, to the extent that this fee could be construed as a tax. It's a state tax, a city-level tax that this federal court would not have jurisdiction to opine on. I believe it's a classic user fee, and that's all it is. There is no evidence in the record that it is a fine, that it is designed to be punitive. It is designed to pay for a much increased cadence of inspections at these large commercial properties. Finally, I'd like to note that there is a severability clause here, as you would find with any good statute. If any portion of this is deemed constitutionally problematic, whether it's under the 4th, the 8th, or the 14th amendment, the rest of the statute should survive. So to the extent there is an outlier provision, Judge Higginson, you had directed me to 67.1 subpart B. If the court were to agree that 6-71B is constitutionally problematic, and I'm certainly not conceding that, I don't think it is, but his best day in court is you take a red pencil to that section, leave the rest of the statute intact, send it back to the city of San Antonio council if they need to amend to bring that subpart into compliance with the constitution. So I think any ruling from this court that was to vacate this statute altogether, or I guess the relief we're seeking at this procedural point is an injunction, a preliminary injunction against this statute, that would be improper on a wholesale basis. The most relief they could conceivably be entitled to is an injunction against limited portions of the statute, thanks to that survivability clause. As to the governmental interest, the final stage of the preliminary injunction test is, of course, weighing the interests here. And I'd like to use my friends on the other side's own words as to what the city of San Antonio interests here. They describe it as, and I quote, a valid and important governmental interest in protecting the public. Record on appeal 183. What are we weighing that against? They've acknowledged it's an important interest. What is that being weighed against? The de minimis expectation of privacy in a vacant apartment that the landlord is looking to rent out and would presumably show to any tenant looking to rent it. If my city of San Antonio inspector shows up there and says I'd like to rent the apartment, I bet he gets a tour. If he shows up with his city of San Antonio credentials on, then maybe he doesn't. But that's the weighing of the interest here. And even Judge Rodriguez held that they failed on all four of the prongs for an injunction. And I believe that's correct. But if nothing else, that fourth prong, the weighing of the interest, goes demonstrably, exponentially against them, this de minimis interest in empty apartments. What's going on in these apartments, put that aside, against the health and safety, safe staircases, lack of rat infestations, lack of cockroach infestations, broken windows, water damage for low income families in the city of San Antonio. That's why this court should affirm the denial of this preliminary injunction, particularly in light of the absolute paucity of evidence submitted by my friends on the other side. Unless the panel has any other questions, I will yield back my remaining 30 seconds. All right, thank you, Counsel. Thank you, Your Honor. All right, back to you, Mr. Grable. Again, the problem is not with the apartment complexes or the units that have tenants. It's everything else. The city of San Antonio already has a maintenance code which allows for it to inspect exterior units, to inspect tenant filled units, to write citations. What they then did was created a program that allows them to lurk and say, hey, look. So for example, SO Apartments, and one day we found that there were issues to exterior walls and gutters. So now you have to pay us $12,500 a year and open up your entire premises on at least a monthly basis. And if you don't, and you try to prohibit our code officials from going in, if you don't pay the fine, then you are subjected to, every day you don't do this, you are subjected to new criminal prosecution and civil liability. And so that's why they filed the lawsuit. The issue is not, hey, look, if there's a complaint with a tenant, you have the maintenance code. Issue a citation, let them fix it. But they took it a step further and said- Does your client dispute the purposes behind the ordinance? We, I'm not sure- The health and safety issues, are those sort of ancillary to all this? Your Honor, my clients take the position that the city is doing this to bolster their general fund. As in the evidence, the city, when they presented it to city council, the department informed the city that this program will bolster- If they cite broken stairwells or other common area safety issues, etc, etc. The position is that $100 fine or whatever is somehow burgeoning the city coffers but without any credence to safety issues? Your Honor, they made an explicit point in the written memo to city council that this program will increase the city's general fund by at least $200,000 a year. Not the department's fund for inspections, but the general fund by $200,000. Assuming that's true, and you heard his argument about the cost to administer the program itself, so assuming there's some financial piece, my question is, do your clients push back against the health safety issues that council argument opposite argues vis-a-vis these common areas, stairwells, broken areas, etc, that go to safety and health? Your Honor, yes, Your Honor, we do oppose that because they were able to inspect, for example, they were able to inspect on one day, and they noted, I will also note, and we brief it, that when they provide notice, they provide notice generally, they just say stairwell. They don't tell my clients what the actual issue is. My clients have to go do an open records request to get that information. But that's, so that's separate. So if they've already inspected, and they've already identified under a pre-existing ordinance, these issues with the stairwell, they cite my clients for the stairwell, and then my clients can go challenge that, or fix it, or do whatever they do. But instead, the city says, because we've noted the stairwell issue, you now have to pay us to inspect your entire property, all of your private areas, on a monthly basis, that's a Fourth Amendment, that's arbitrary. On its face, that's arbitrary. But isn't that what happens in criminal law all the time? You're adjudicated guilty, you're a violator, you've got to pay a fine, you've got to give access to your house for probation. So, Your Honor, that, so this is another issue I have, right, and this is, I hinted on this, the code official gets, has subjective discretion to write a, quote, general violation, because what the code does is it incorporates, the inspection program incorporates, quote, general provisions of the maintenance code. So the code official can just cite you for a general stairway. And then it doesn't matter how long that process takes to fight the actual citation. But you're arguing all this stuff that could happen, all this stuff that could happen. I mean, you haven't yet put your, pushed your foot down on something that has actually occurred in, I mean, it's a parade of horribles, it may be true, but that's not why we're here. Well, I mean, you're at the preliminary injunction stage. Yes, Your Honor. With Judge Rodriguez, right? We have not gone for, we're at the preliminary injunction. Judge Rodriguez found in his hearing you did not satisfy the factors. And I'm still waiting with 11 seconds left, you know, for you really to go down the elements of why you satisfied that. Most of your arguments have been the beef against the ordinance, et cetera, et cetera. I mean, we're at the preliminary injunction stage. He denied the preliminary injunction. You've complained because it was a text order. It wasn't full-blown, et cetera, et cetera. But you've not articulated, you're having to brief, but while here, as to how you satisfied the prongs of the preliminary injunction. And that's all that's in front of the panel. That's all, not policing the policy of San Antonio, into that backdrop, the factors on the preliminary injunction. And that's narrowly what he has. I'm going to give you one declarative sentence with no semicolons to tell why you satisfied the requisites on the preliminary injunction. Yes, Your Honor. So the likelihood of success on the merits depends on you finding that there's a violation of at least one of the constitutions to include, violations to include the Fourth Amendment. The irreparable harm, the biggest issue is that every day that they are fighting and saying, we are not just going to freely give up our Fourth Amendment and our Eighth Amendment rights and our rights to due process. The moment we give that up, we are subject to criminal and civil prosecutions. That is enough for irreparable harm. And then, of course, the balancing issue. The balancing issue, it's very clear that the public interest is always to enjoin governments from violating constitutional rights of individuals. And so those are the factors, Your Honor. All right. Thank you, sir. I appreciate your responsiveness to my question. We've got you down both sides. We have the briefs. We'll take a hard look at it and we'll rule on it expeditiously. Thank you. All right.